

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00343-CV

———————————————

SUNBAL ZAFAR, Appellant

V.

SADAF SAGHIER, Appellee

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-337023-22

Before Birdwell, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant Sunbal Zafar claimed that her fellow doctor, Appellee Sadaf Saghier, hit her in the nose at the medical practice where they worked, and she reported the alleged assault to the Texas Medical Board and to the police. But the Texas Medical Board dismissed Zafar's complaint, and although the police initially arrested Saghier for felony aggravated assault, the district attorney's office later reduced and then dismissed the criminal charges against Saghier. So, when Zafar sued Saghier for civil damages for the alleged assault, Saghier counterclaimed for malicious prosecution and intentional infliction of emotional distress. The jury sided with Saghier and awarded her $1 million in compensatory and exemplary damages.

In what we construe as three overarching issues, Zafar asserts that (1) the evidence was insufficient to support the compensatory damages awarded for Saghier's criminal attorney's fees and mental anguish; (2) the award of exemplary damages was premised on a defective jury charge and, regardless, must be adjusted in accordance with the statutory cap if this court reverses any of the compensatory-damage awards; and (3) the trial court abused its discretion by allowing Saghier's counsel to ask her leading questions. Saghier concedes that the damage award for her criminal attorney's fees lacked sufficient evidentiary support, and the record reveals that the award for future mental anguish also lacked sufficient evidentiary support. These flawed awards, in turn, require a reduction of the exemplary-damages award in accordance with the statutory cap. With these modifications of the judgment, we will affirm.

# I. Background[1]

Zafar and Saghier were gastroenterologists who worked for the same medical practice. The doctors did not get along, and in early 2022, their relationship took a turn for the worse.

## A. Incident, Accusation, and Aftermath

The pivotal incident occurred at the parties' medical practice in April 2022. According to Zafar, Saghier grabbed her hand "hard," alluded to a rent-related issue, and hit her in the face.[2] According to Saghier, she never touched Zafar or referenced rent; instead, Zafar "pounded hard on the table," alluded to a prior complaint that Saghier had made about Zafar to the practice's leadership,[3] then screamed and accused Saghier of hitting her.

Saghier immediately called both the practice's leadership and 911. Police body-camera footage from that day showed Saghier relaying her side of the story, asking the police to swab her hands and Zafar's nose to establish her innocence, and attempting

---

[1]We recite the facts in light of the jury's verdict, deferring to its implicit resolution of conflicts in the evidence. *See Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018); *Bearden v. LeClair*, No. 02-20-00177-CV, 2022 WL 3273598, at *8 (Tex. App.—Fort Worth Aug. 11, 2022, no pet.).

[2]Zafar was taken to the hospital, where tests revealed a nasal fracture. The fracture's age was ambiguous and disputed.

[3]According to Saghier, Zafar alluded to Saghier's having reported to the practice's leadership regarding damaged office items and Saghier's suspicion that Zafar had caused the damage.

to diffuse tension between Zafar's husband and her own (both of whom arrived at the medical practice after the incident).

Saghier later testified that, as soon as the police responded to Zafar's accusation of assault, she "kn[e]w what [wa]s at stake"—her "whole life[; her] license [wa]s at stake." By the time she arrived home that evening, she was "desperate" for professional mental help. She explained to the jury that she had "two small kids" and was "the breadwinner of the family," and after the incident, she "[c]ould not cry . . . [or] sleep" and "d[id]n't even know how to handle this." She found a psychiatrist who had availability "the very next day" and scheduled an appointment.

The psychiatrist's records—which were later admitted into evidence at trial—described Saghier as "very anxious" and "tearful" at the appointment. The records noted that Saghier was suffering from "poor appetite, poor sleep, [and] anhedonia," i.e., "los[s of] the ability to enjoy the things [she] usually d[id]."

Meanwhile, the practice's leadership told Saghier "not to come back to the office," and Zafar reported Saghier's alleged assault to the Texas Medical Board. Within a day of the incident, a surgical facility where Saghier practiced had "precautionarily suspended" her privileges due to "an immediate risk of substantial harm to the health and safety" of those who worked there. The surgery center asked Saghier to undergo a fitness-to-practice evaluation, and Saghier took a leave of absence to do so.

But the fallout continued. Less than two weeks after the incident, Zafar hired an attorney to sue Saghier for assault, and the attorney sent Saghier a letter informing her of the impending litigation and asking her to preserve evidence. Saghier's psychiatrist's notes reflected that, not long thereafter, Saghier began suffering from "nightmares, crying spells, [a] sense of helplessness, insomnia, [and] flashbacks," as well as "intrusive, invasive, or unwanted thoughts" and "feelings of loneliness, isolation, hopelessness/worthlessness." The psychiatrist diagnosed Saghier with "PTSD" and "[a]djustment disorder with mixed anxiety and depressed mood." She prescribed Saghier medication for her anxiety and PTSD.

As this was happening, Zafar was also working with the police to pursue Saghier's criminal prosecution. About two months after the incident—in June 2022—the police issued a warrant for Saghier's arrest for felony aggravated assault. Saghier later told the jury that, in an attempt to protect her children, she waited until they went to sleep before turning herself in on the warrant. She spent the night in jail where, according to Saghier, she was strip-searched and had her mugshot taken. She described jail as the "[w]ors[t] experience" and recounted an illustrative anecdote about being told that "there [had been] a murder in the room [she was in] between the two inmates," and the "other people [in the jail room with her we]re laughing about murder cases, [and about] how they have been in and out."

The district attorney later reduced the charge against Saghier to a misdemeanor. But the reduced charge did not stop Saghier's mugshot from spreading throughout

5

her social and professional community,[4] nor did it spare her the expenses associated with defending herself in court, such as the cost of paying her criminal defense attorney.

These expenses were particularly difficult given the limitations on Saghier's ability to practice medicine. Although Saghier had completed her fitness-to-practice evaluation and a psychiatrist—Dr. Douglas Crowder—had found her fit to practice, Saghier lost her privileges at several surgical facilities due to the criminal case. Plus, between the criminal case and the still-pending Texas Medical Board complaint, she had trouble securing malpractice insurance.

Ultimately, about nine months after the alleged incident—on the day before her criminal case was set for trial—the district attorney's office dismissed the charges against her.[5] Although Saghier objected to the dismissal out of a desire to prove her innocence, the trial court overruled her objection.

After Saghier's criminal case was dismissed, she stopped seeing her psychiatrist. The psychiatrist had recommended that she continue therapy, noting that "recovery from . . . trauma of this nature can take months to years," but Saghier's expenses were adding up. As Saghier later told the jury, the psychiatrist visits were "self-paid, cash," and Saghier "could not afford any more" appointments.

---

[4]Saghier's fitness-to-practice evaluation report reflected that "Dr. Zafar's husband ha[d] shared her mugshot with their social group."

[5]Zafar recalled the prosecutor telling her, "the DA's office does not work for you."

But Saghier's troubles were not over. It took another four months before the Texas Medical Board completed its investigation and dismissed Zafar's complaint for lack of evidence. And even then, because some surgical facilities denied privileges to anyone who had either been charged with a crime or failed to promptly report being charged with a crime, Saghier permanently lost her privileges at three surgical facilities.

## B. Litigation, Trial, and Judgment

Additionally, Zafar's civil suit against Saghier was still pending. So, at that point, Saghier counterclaimed for malicious prosecution and intentional infliction of emotional distress.

At trial, Saghier described Zafar's accusation as a "nightmare," and she testified to everything she had been through—her termination from her medical practice, her loss of privileges at three surgical facilities, her medical license's suspension, her arrest on false charges, her strip-search and night in jail, her mugshot's proliferation in her community, her depletion of savings, her inability to provide for her family, and her need for psychiatric help through it all.

During this testimony, Saghier's counsel asked Saghier several leading questions, and Zafar objected to three of them. Specifically, Zafar objected when Saghier's counsel (1) asked her if hitting a coworker in the face would have been jeopardizing to her medical career, (2) asked her if she had ever assaulted anyone, and (3) asked her to confirm that Dr. Crowder—the man who had performed Saghier's fitness-to-practice evaluation—was a psychiatrist. The trial court overruled Zafar's

7

objections to these questions, and Saghier answered them, saying "Yes," "No," and "Psychiatrist," respectively.

After hearing this and other evidence, the jury found that Zafar had both maliciously prosecuted Saghier and intentionally inflicted emotional distress upon her. It assessed $462,022 in exemplary damages for Zafar's malicious prosecution. But in assessing compensatory damages, the jury was not asked to specify which tort caused the relevant damage, nor was its response conditioned on a finding of liability on a specific tort. Rather, the jury was asked in broad form how much money would compensate Saghier for the "injuries . . . that resulted from the occurrence in question" and for her "defense in connection with the criminal allegations." Neither party objected to the broad form questions, the failure to condition such questions on specific liability findings, or the broader charge structure.

Thus, in the end, the jury awarded $537,978 in compensatory damages for both torts, including $15,095 for Saghier's criminal attorney's fees; $12,875 for other economic damages; $255,004 for Saghier's past mental anguish; and $255,004 for Saghier's future mental anguish. The trial court rendered judgment accordingly, awarding Saghier an even $1 million in damages.

## II. Discussion

Zafar challenges (1) the sufficiency of the evidence to support the jury's awards of compensatory damages, namely, (a) economic damages for Saghier's criminal attorney's fees and (b) noneconomic damages for her past and future mental anguish;

8

(2) the jury charge on and statutory limitation of the exemplary-damages award; and (3) the trial court's ruling on Zafar's objections to Saghier's counsel's leading questions.[6]

## A. Compensatory Damages

First, Zafar takes issue with the legal and factual sufficiency of the jury's award of (1) economic damages to compensate Saghier for her criminal attorney's fees, and (2) noneconomic damages for her past and future mental anguish.[7]

### 1. Standard of Review

To determine whether the evidence is legally sufficient to support an award of damages, we view the evidence in the light most favorable to the challenged award and ask whether there is more than a mere scintilla of evidence to support it. *Anderson*, 550 S.W.3d at 616; *Bearden*, 2022 WL 3273598, at *8. Reviewing the award's factual sufficiency, meanwhile, requires us to "consider[] and weigh[] all the pertinent record evidence . . . [to] determine [if] the credible evidence supporting the [award] is so

---

[6]Zafar structures her issues as five: (1) the sufficiency of the evidence to support the award of past-mental-anguish damages; (2) the sufficiency of the evidence to support the award of future-mental-anguish damages; (3) the sufficiency of the evidence to support the award for criminal attorney's fees; (4) whether the exemplary-damages award is undermined by the jury charge, statutorily excessive, or—to the extent that the alternative $200,000 statutory cap applies—constitutionally excessive; and (5) whether the trial court abused its discretion by permitting Saghier's counsel to ask her leading questions. We reorganize these issues for clarity.

[7]Zafar preserved her sufficiency complaints in post-trial motions. *See Perez v. Williams*, No. 02-21-00395-CV, 2022 WL 17351581, at *5 (Tex. App.—Fort Worth Dec. 1, 2022, no pet.) (summarizing preservation methods for sufficiency challenges to a jury verdict).

weak, or so contrary to the overwhelming weight of all the evidence, that the [award] should be set aside." *Bearden*, 2022 WL 3273598, at \*8; *see Perez*, 2022 WL 17351581, at \*6. Our legal and factual sufficiency reviews thus overlap; if the evidence is factually sufficient, then it is necessarily legally sufficient, and if it is legally insufficient, then it is necessarily factually insufficient.

Under both standards of review, if the evidence conflicts, the jury—not this court—resolves the conflict. *Anderson*, 550 S.W.3d at 616; *Bearden*, 2022 WL 3273598, at \*8. "[T]he jury's role is to evaluate the credibility of the witnesses and reconcile any inconsistencies, and as a general proposition, the jury may believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness." *Bearden*, 2022 WL 3273598, at \*8; *see Anderson*, 550 S.W.3d at 616.

### 2. Economic Damages for Criminal Attorney's Fees

Zafar's first sufficiency challenge is simplified by the fact that Saghier has conceded it.

Zafar argues that the evidence is legally and factually insufficient to support the jury's award of $15,095 for Saghier's criminal attorney's fees. Saghier agrees. We thus sustain this portion of Zafar's first issue and reverse the $15,095 award of economic damages attributable to Saghier's criminal attorney's fees.

### 3. Noneconomic Damages for Mental Anguish

Zafar's second and third sufficiency challenges are not as simple. In them, she attacks the legal and factual sufficiency of the evidence to support the jury's awards for (a) past mental anguish and (b) future mental anguish.

### a. Past Mental Anguish

Turning first to past mental anguish, Zafar's challenge is two-fold: she argues that there is insufficient evidence of both (1) the existence of compensable past mental anguish and (2) the rational connection between the past mental anguish suffered and the $255,004 amount awarded. *See Gregory v. Chohan*, 670 S.W.3d 546, 551, 554 (Tex. 2023) (plurality op.) (reiterating that there must be not only sufficient evidence of the existence of compensable mental anguish—evidence of its "nature, duration, and severity"—but also "a rational connection between the injuries suffered and the *amount* awarded"); *SCI Tex. Funeral Servs., Inc. v. Nelson*, 540 S.W.3d 539, 544 (Tex. 2018) (noting that "a plaintiff must generally provide 'direct evidence of the nature, duration, and severity of their mental anguish'"); *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013) (reiterating that "[t]here must be both evidence of the existence of compensable mental anguish and evidence to justify the amount awarded").

### i. Existence

Generally, past mental anguish is compensable only if the plaintiff produces evidence of its "nature, duration, and severity" to show that it "cause[d] a substantial

11

disruption in [her] daily routine or a high degree of mental pain and distress." *Hancock*, 400 S.W.3d at 68; *see Bennett v. Grant*, 525 S.W.3d 642, 648 (Tex. 2017). Zafar asserts that Saghier's evidence fell short of this standard in several ways.

First, Zafar argues that "Saghier's testimony regarding her alleged mental anguish sustained in the past is generalized and conclusory," using "buzzwords untethered to any specifics."[8] But the record refutes this.

While Saghier summarized her experience in general terms—describing it as "a nightmare," "trauma[tic]," and "shocking"—she backed up her generalizations with a detailed account of her mental and emotional turmoil:

- Saghier testified that, when Zafar accused her of assault, Saghier started shaking, "had tears," and "was in a shock."

- She told the jury that, after the incident, she "d[id]n't even know how to handle this"—she was "shaken, traumatized" and "[c]ould not cry[, c]ould not sleep."

- Saghier testified that, by the time she got home on the day of the incident, she was "desperate" for professional mental help and made numerous phone calls to doctors until she found a psychiatrist who had availability "[t]he very next day." She recalled crying when she found an available doctor, and she explained to the jury that she had been "praying . . . [to] God, please find me one[; o]therwise, my kids are going to come [home] from school and they're going to see."

- Saghier testified that her anxiety was severe enough that her psychiatrist prescribed medication for it.

---

[8]Zafar also asserts that Saghier's description of suffering distress after the incident was controverted by testimony that she had been chuckling with the police. But the referenced testimony came from Zafar's husband. And the jury was free to believe Saghier over Zafar's husband. *See Anderson*, 550 S.W.3d at 616–17.

12

- She testified that, although she attempted to shield her children from the ramifications of her criminal case, her "daughter woke up" as she was leaving for jail and "would not let [her] go." Saghier verbalized her anxiety in that moment, stating that she "did not know [if she was] coming back" home.

- She described the degrading book-in process at the jail, stating that "[t]hey put handcuffs on [her]" and "t[ook her] mugshot picture."

- Saghier testified to the physical shame and humiliation accompanying her night in jail as well. Noting that she usually "dress[ed] modest," she recalled how the jailers made her "take off [her] clothes because they want[ed] to see . . . [that she] d[id]n't have anything on [her]." She emphasized that "they won't even let you take off your undergarments in the private[—t]hey're watching you, literally." She enunciated the shame she felt, saying, "you feel this low."

- She also recounted the fear she experienced during her night in jail. Saghier recalled that "the room [she] was in, [she] was told before there was a murder in the room between the two inmates[,]" and "[i]t[ wa]s scary sitting among the other people who are laughing about murder cases, how they ha[d] been in and out" while she was "being punished for something [she] did not even do."

- She testified that, after her arrest, her "mugshot picture was everywhere in the society, among the doctors," and even when she was able to practice medicine again, it "affected [her] credibility, [her] profession, [and her] referrals"—and her "livelihood depend[ed] on the referrals."

- She told the jury how she was "the breadwinner of the family" and had "small kids" but all the expenses brought on by Zafar's accusation—including the legal fees she had to pay for her Texas Medical Board complaint, employment issues, and criminal case—had depleted her savings and impeded her ability to save or buy a house.[9]

---

[9]On appeal, Zafar argues that Saghier was to blame for her own financial issues, asserting that Saghier's practice had not been doing well before the incident and that Saghier's lost wages were attributable to her own failure to timely report her arrest to her surgical facilities. But these allegations were disputed. Saghier testified that her practice was doing fine before the incident. And she explained that, when she learned of the warrant for her arrest, "all [that was] on [her] mind was [her] two little kids"— not reporting her arrest to the surgical facilities "within 24 hours after coming out of

13

- Saghier testified that she "c[ould ]not even quantify how much sleep [she] ha[d] lost and nightmares" from all the aftereffects of Zafar's accusation.[10]

This testimony was not conclusory. *See Anderson*, 550 S.W.3d at 620 (quoting plaintiff's description of "two-year nightmare" caused by defamation and holding that testimony was legally sufficient based on plaintiff's description of his inability to sleep, his family noticing a change in his demeanor, and his need for psychiatric assistance and anti-anxiety medication); *cf. Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231–32 (Tex. 2011) (holding that evidence of decedent's daughters' mental anguish was legally insufficient when daughters gave "cursory" descriptions of events as "very difficult" and "devastati[ng]" but did not describe "how the events specifically affected them").

Zafar next argues that Saghier's evidence fell short of the relevant evidentiary standard because her testimony was "uncorroborated." But while "corroborating evidence [may be] helpful . . . , we do not require it when the plaintiff's testimony provides sufficient evidence of mental anguish." *Anderson*, 550 S.W.3d at 619–20 (holding that award for past mental anguish was supported by legally sufficient evidence based on plaintiff's uncorroborated testimony); *Bearden*, 2022 WL 3273598,

---

jail." The jury was free to believe Saghier and weigh the evidence accordingly. *See id.* at 616; *Bearden*, 2022 WL 3273598, at *8.

[10]Zafar asserts that "Saghier *had* to 'quantify' those things if she wanted to be compensated for them." But this overreads the "nature, duration, and severity" requirement. Although "[g]eneralized, conclusory descriptions of how an event affected a person are insufficient evidence on which to base mental[-]anguish damages," *Anderson*, 550 S.W.3d at 619, Saghier was not required to identify the precise number of anti-anxiety pills she took, hours of sleep she lost, days during which she felt hopeless, or individuals who saw her mugshot.

14

at *18 ("Although corroborating evidence of mental anguish, including from a spouse or friend, can be helpful in determining evidentiary sufficiency, a plaintiff's testimony alone can suffice."). Moreover, there was, in fact, corroborating evidence:

- A 911 call recording captured Saghier reporting the incident in an anxious, teary, tone moments after Zafar accused her of assault.

- Saghier's psychiatrist's records reflected that the psychiatrist diagnosed Saghier with "PTSD" and "[a]djustment disorder with mixed anxiety and depressed mood."

- Saghier's psychiatrist noted that she had prescribed medication for Saghier's "PTSD."

- The psychiatrist's records documented that, about a month after the incident, in May 2022, Saghier was suffering from "nightmares, crying spells, [a] sense of helplessness, insomnia, [and] flashback[s]." And by June 2022, Saghier was "[f]eeling hopeless" and "traumatized."

- The psychiatrist's records further showed that, in August 2022, Saghier was still stressed, anxious, "occ[assionally] tearful," and experiencing "flashbacks." And again in September 2022, the psychiatrist noted that Saghier still had "[o]ccassional nightmares" and was continuing to suffer from "[a]djustment disorder" and "chronic PTSD."

- Dr. Crowder's fitness-to-practice evaluation reiterated Saghier's psychiatrist's PTSD diagnosis and documented that Saghier's husband "ha[d] observed symptoms consistent with PTSD beginning after the [incident]."

- Dr. Crowder's fitness-to-practice evaluation reflected that Saghier was "tearful at times" and suffered from "posttraumatic nightmares, changing appetite, and a sense of humiliation because Dr. Zafar's husband had shared her mugshot with their social group."

- Saghier was shaking when she testified, and she told the jury that such shaking occurred when she went "back in time [to] when this incident happened[, and] . . . th[e] nightmare flares."

Thus, although Saghier's testimony could have stood alone, it did not need to.

15

Nonetheless, in Zafar's third argument, she asserts that Saghier's distress was insufficiently severe. Zafar highlights the symptoms that Saghier did not describe—symptoms such as diarrhea, dry heaving, and suicidal ideations—and questions whether Saghier's anxiety impacted her life, noting that her psychiatrist described her as "able to maintain a good level of functioning." *Cf. Bearden*, 2022 WL 3273598, at *18–19 (discussing dry heaving, diarrhea, and suicidal thoughts). But a person can suffer mental anguish even if she continues "functioning" and does not experience diarrhea, dry heaving, or suicidal thoughts. "Individuals experience mental anguish in myriad ways, so each case is unique." *Anderson*, 550 S.W.3d at 619. And the jury had the discretion to "distinguish between shades and degrees of emotion"—"between disappointment and severe disappointment, between embarrassment and wounded pride, between anger and indignation." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995).

Saghier presented evidence that the distress caused by Zafar's false accusation interfered with her desire to eat, caused her to lose sleep, impeded her ability to enjoy otherwise-enjoyable activities, and—unlike any stress she had experienced before—necessitated psychiatric assistance and medication. *Cf. Hancock*, 400 S.W.3d at 70 (holding that there was insufficient evidence of compensable mental anguish when the plaintiff "did not require medical attention" nor did he "elaborate on the impact of anxiety or depression on his life, nor did other witnesses corroborate an outward manifestation of the mental anguish [the plaintiff] allegedly experienced"); *Serv. Corp.*

16

*Int'l*, 348 S.W.3d at 232–33 (holding that testimony was sufficient to support award for mental anguish when decedent's wife testified that, upon learning decedent's grave had been tampered with, she "could not sleep," had headaches and "burning in her stomach," sought medical help, and needed "medication for anxiety and depression"). Based on this evidence, a reasonable jury could have concluded that Saghier experienced a "high degree of mental pain and distress." *Anderson*, 550 S.W.3d at 619–20 (holding that plaintiff's testimony was legally sufficient to show "a high degree of mental pain" when, as a result of work-related defamation, "[h]is familial relationships were impacted; his demeanor changed; he was unable to sleep; and he was treated for anxiety and depression"); *see Serv. Corp. Int'l*, 348 S.W.3d at 233 (stating that, even if the plaintiff's "daily routine was not substantially disrupted . . . , that lack of evidence did not negate the evidence that she *did* suffer compensable mental anguish").

This brings us to Zafar's final argument—that the duration of Saghier's mental anguish was ambiguous and necessarily short-lived as it began and ended with her criminal prosecution. But as Saghier's evidence demonstrated, a false criminal accusation and prosecution can have knock-on effects both before and after the criminal case. The dismissal of Saghier's criminal case did not erase her arrest record, delete her mugshot from the internet, restore her reputation in the medical community, reinstate her privileges at surgical facilities, or replenish her savings.

And although the severity of Saghier's symptoms waxed and waned as events unfolded, she demonstrated a "high degree of mental pain and distress" that began

17

the day Zafar falsely accused her, grew worse as the criminal case took shape, and continued even after the criminal charges were dismissed as Saghier's medical license, credibility in the community, privileges at surgical facilities, and inability to financially provide for her family remained at risk. *See Hancock*, 400 S.W.3d at 68.

Thus, after considering all of the pertinent evidence—while giving deference to the jury's credibility determinations and its resolution of conflicts in the record—we conclude that Saghier sufficiently demonstrated the "nature, duration, and severity" of her compensable past mental anguish. *Anderson*, 550 S.W.3d at 618–19; *Bearden*, 2022 WL 3273598, at *18–19. The evidence was legally and factually sufficient to support the existence of compensable past mental anguish, and we overrule this portion of Zafar's issue.

### ii. Amount

Zafar next asserts that the $255,004 amount awarded for Sanghier's past mental anguish "is excessive." She emphasizes the high ratio of noneconomic damages to economic damages, compares the past-mental-anguish award to that in other cases, and argues that the jury's awarding the same amount for both past and future mental anguish and awarding an even $1 million total "indicates that the jury . . . picked a number at random."

"We review an excessiveness challenge for factual sufficiency, something that is committed to our exclusive jurisdiction, and that is highly deferential to the jury's findings." *Bearden*, 2022 WL 3273598, at *19 (internal citations and quotation marks

omitted); *see Anderson*, 550 S.W.3d at 620 (clarifying that "excessiveness of a damages award is a factual-sufficiency inquiry"). The "amount awarded must be fair and reasonable compensation, given the evidence presented." *Bennett*, 525 S.W.3d at 648; *see Bearden*, 2022 WL 3273598, at *19 (noting that there are "few specific guideposts to follow" in appellate review of amount of noneconomic-damages award).

As an initial matter, the ratio of economic to noneconomic damages is not dispositive. *See Gregory*, 670 S.W.3d at 559–60 (stating in plurality opinion that "the possibility that economic and noneconomic damages may correlate or inform one another in certain situations does not mean that they are necessarily connected in all cases or that the ratio between the two is always a useful tool"). And while it may be a useful tool in some cases, it is of limited usefulness here because, as Zafar acknowledges, Saghier did not seek to recover for all the financial effects of Zafar's false accusation. *See id.* (noting further in plurality opinion that "[t]he usefulness of such ratios will vary depending on the nature of the case"). For example, Saghier described how Zafar's accusation had impacted her income, but she did not attempt to establish her lost income with particularity, nor did she ask the jury to award compensation for that lost income. Such a decision says nothing about the severity of the mental anguish she experienced, though. *Cf. id.* at 559 (reasoning in plurality opinion that ratio of economic to noneconomic damages was unhelpful in wrongful death case because "[t]o suggest that greater pecuniary loss necessarily justifies greater

19

noneconomic damages is to suggest that the families of a well-paid decedent suffer more grief and pain than the families of those with less income").

Comparing the amount of Saghier's award to those affirmed in other cases is of limited usefulness for similar reasons. Mental-anguish damages are intensely fact-dependent, and "[m]ental-anguish awards in wildly differing amounts have been upheld depending on the underlying claim." *Bearden*, 2022 WL 3273598, at *19–21 (summarizing case law involving mental-anguish awards ranging from $20,000 to $2 million). The amount of other awards—which were necessarily based on the circumstances of those cases and the evidence presented to those juries—says little about the amount of compensable mental anguish shown by the evidence in this case. *Cf. Anderson*, 550 S.W.3d at 619 (noting that "each case is unique").

The key question is instead whether the jury awarded "an amount that a reasonable person could possibly estimate as fair compensation" based on the evidence presented. *Id.* at 618; *see Gregory*, 670 S.W.3d at 561 (stating in three-justice portion of opinion that there must be a "rational basis . . . connecting the amount . . . to the evidence"). Often, the amount of the jury's "estimate [of] fair compensation" is illuminated by the parties' closing arguments. *See Gregory*, 670 S.W.3d at 561 (noting in three-justice portion of opinion that "the rational basis may be revealed by lawyer argument rationally connecting the amount sought . . . to the evidence"). The attorneys may use their closing arguments to suggest rational, evidence-based values for the plaintiff's intangible injury, and it is not uncommon for

the jury's verdict to match one of the parties' suggested values. *See, e.g., Garza v. Escamilla*, 712 S.W.3d 718, 727–30 (Tex. App.—Houston [14th Dist.] 2025, no pet.) (upholding amount of noneconomic damages awarded by referencing rational basis supplied in counsel's closing argument). We have no way of knowing whether the $255,004 amount traces to a closing argument here, though, because the closing arguments were not transcribed.[11] The record is thus unclear as to how the $255,004 award compared to the parties' suggested valuations or where the $255,004 amount came from.

But our inability to read the jury's mind does not mean that the $255,004 amount was excessive, nor does it mean that the jury disregarded the charge instructions and "picked a number at random" as Zafar contends. Again, noneconomic harm "[is] not amenable to calculation with 'precise mathematical precision,'" and we must yield to the jury's award if it is reasonable in light of the evidence. *Bearden*, 2022 WL 3273598, at *16–21; *see Bennett*, 525 S.W.3d at 648.

We have already recounted the extensive evidence showing the wide-ranging effects of Zafar's false accusation and the mental anguish that it caused. Saghier demonstrated that her anxiety necessitated psychiatric intervention, and she testified that she paid at least $100 per psychiatrist visit, though she thought she remembered

---

[11]In Saghier's appellate brief, she "represents to th[is c]ourt that it was in closing argument that the attorneys argued what amounts should be awarded."

paying significantly more. Dr. Crowder's records confirmed that psychiatrists indeed charged more; his bills reflected a rate of $500 per hour.

Regardless, the evidence showed that psychiatric assistance was but a band-aid anyway. Saghier detailed the humiliation of being strip-searched in jail, the experience of spending a night with accused criminals as they laughed about murder, and the prospect of a lengthy prison sentence based on false criminal charges. She testified that she "spent almost [$]101,000 . . . to hire five lawyers" throughout the saga, including hiring criminal defense counsel, a "Medical Board attorney, [and] another civil law [attorney] to save [her] old jobs at . . . medical facilities." She stated that she had depleted her savings—savings her family had hoped to use to buy a house—and had been forced to take out a loan to pay her expenses. And even after she returned to work, Saghier "struggled" because her practice "depend[ed] on reference[s] from family doctor[s]," but her "mugshot picture was everywhere . . . among the doctors," tainting her reputation and "affect[ing her] credibility, [her] profession, [and her] referrals." She described the intense stress these pressures generated in light of her "two small kids" at home and her role as "the breadwinner of the family."

How many breadwinners would agree to months of not knowing if they could pay their bills or provide for their families—then or ever in the future—if they received $255,004 for the sleepless anxiety? How many doctors would be willing to jeopardize their medical licenses, hospital privileges, and professional credibility in exchange for $255,004? And how many law-abiding citizens would accept $255,004 as

22

fair payment for a humiliating jailhouse strip search and a months-long threat to their liberty? *See Bearden*, 2022 WL 3273598, at \*19–21 (upholding $485,000 award for past mental anguish in malicious-prosecution case and emphasizing threat to plaintiff's liberty).

Given the evidence of Saghier's distress, her testimony of the financial repercussions of Zafar's actions, and the "latitude" we must give to the jury in its task of quantifying the intangible, we cannot say that the award of $255,004 for Saghier's past mental anguish was contrary to the overwhelming weight of the evidence. *See Anderson*, 550 S.W.3d at 618 (explaining that the jury has latitude in determining noneconomic damages because such damages "offer a pecuniary remedy for non-pecuniary harm and are not amenable to calculation with 'precise mathematical precision'" (footnote omitted)); *Bennett*, 525 S.W.3d at 648 (reiterating that, "given the impossibility of any exact evaluation of mental anguish[,] . . . juries [must] be given a measure of discretion in finding damages" (internal quotation marks omitted)); *see also Bearden*, 2022 WL 3273598, at \*19–21. The jury had the benefit of observing Saghier's demeanor and watching her shake as she testified. Although we cannot read the jury's mind as to how it decided on the $255,004 figure, its decision was supported by legally and factually sufficient evidence.

We overrule this portion of Zafar's issue.

23

### b. Future Mental Anguish

Zafar's challenge to the future-mental-anguish award is different, though. Zafar asserts that there was no evidence that Saghier would experience any future mental anguish at all—much less evidence to support the $255,004 amount. And we agree.

"To recover damages for future mental anguish, the plaintiff must . . . demonstrate a reasonable probability that compensable mental anguish will persist." *Anderson*, 550 S.W.3d at 619. There is no such evidence in this case.

Saghier testified that she no longer took the anti-anxiety medication that her psychiatrist had prescribed, and although the psychiatrist had recommended that she continue therapy, Saghier did not express any intention to restart her psychiatrist appointments in the future. Although Saghier was shaking when she testified, she stated that she did not shake on a daily basis; it was only when she would "go back in time [to] when this incident happened."

In Saghier's appellate brief, she defends the jury's award by arguing that "there [wa]s a reasonable probability that Zafar's malicious conduct toward Saghier w[ould] continue." But as Zafar points out, a jury is not permitted to award compensatory damages based on the possibility that the tortfeasor will commit additional torts in the future. *Cf.* 25 C.J.S. *Damages* § 34 (2026) ("The mere threat of future harm, not yet realized, is not enough.").

Perhaps realizing this, Saghier added two additional defenses of the award during oral argument. She asserted that the jury could infer future mental anguish

from (1) the torts themselves and (2) the evidence of past mental anguish. But this is not the law.

The torts themselves cannot support an award of de facto future mental anguish. "Verifiability is at issue in every mental[-]anguish case, and the source of the anguish . . . is irrelevant in considering whether a plaintiff has met h[er] burden." *SCI Tex. Funeral Servs.*, 540 S.W.3d at 544 (noting that mental anguish is "inherently difficult to verify" so "genuineness" is one of the "principal concerns"); *see Serv. Corp. Int'l*, 348 S.W.3d at 231 (disagreeing with lower court's conclusion that "direct evidence [of mental anguish] is not necessarily required in cases involving particularly shocking or disturbing events or injuries because those events or injuries in and of themselves support an inference that mental anguish accompanied them"); *see also Gregory*, 670 S.W.3d at 557 (writing for plurality and chastising court of appeals for departing from the evidentiary requirements for mental-anguish damages based on the idea that "[d]eath is different"); *id.* at 569 (Devine, J., concurring, joined by Boyd, J.) (agreeing with plurality that "the rules governing damages for noneconomic injuries like mental anguish . . . apply in wrongful-death cases just as in personal-injury cases" so the "claimants bear the burden of establishing both the existence and amount of such damages, just as they do for economic damages").

As for inferring future mental anguish from the plaintiff's past experience, past mental anguish is not, standing alone, evidence of future mental anguish. *See, e.g., Anderson*, 550 S.W.3d at 618 (holding that "[s]ome evidence support[ed] the award of

25

past mental-anguish damages, but no evidence support[ed] an award of damages for future mental anguish"); *Wolf v. Starr*, 617 S.W.3d 898, 907 (Tex. App.—El Paso 2020, no pet.) (holding that plaintiff presented sufficient evidence of past mental anguish but that "no evidence elicited from any source supports an award of future mental anguish"); *cf. Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 916–18 (Tex. 2008) (holding that jury's failure to award damages for past mental anguish did not undermine verdict awarding damages for future mental anguish). Rather, "[t]o recover damages for future mental anguish, the plaintiff must further demonstrate a reasonable probability that compensable mental anguish will persist." *Anderson*, 550 S.W.3d at 619.

Saghier has not identified any evidence that her past mental anguish will persist into the future. *See id.* We thus sustain this final portion of Zafar's compensatory-damages issue and reverse the $255,004 award attributable to Saghier's future mental anguish.

## B.    Exemplary Damages

Zafar next challenges the jury's award of exemplary damages. She raises two arguments in this regard, both of which are premised on Chapter 41 of the Texas Civil Practice and Remedies Code.

As relevant here, Chapter 41 prohibits an award of exemplary damages absent an award of compensatory damages, *see* Tex. Civ. Prac. & Rem. Code § 41.004(a), and it caps the amount of exemplary damages at "(A) two times the amount of economic

26

damages[] plus (B) . . . any noneconomic damages found by the jury," *id.* § 41.008(b)(1) (going on to provide an alternative cap and exceptions inapplicable here). Zafar asserts that, given these statutory limitations, (1) the structure of the jury charge was fatally flawed because it authorized exemplary damages on the malicious-prosecution claim but did not specify the tort for which the jury awarded compensatory damages; and (2) regardless, to the extent that this court has reversed any of the compensatory-damage awards, the exemplary-damages award must be adjusted in accordance with the statutory cap.[12]

### 1.    Jury Charge

Zafar's first contention—her complaint regarding the jury charge—is not preserved.[13]

In essence, Zafar argues that because the exemplary-damages award was premised on a broad-form question that commingled a theory of liability supporting

---

[12]Zafar also raises a contingent argument that, to the extent this court reverses all of Saghier's mental-anguish damages, then the alternative $200,000 statutory cap on exemplary damages applies, and that amount is excessive in comparison to Saghier's other compensatory damages. *See* Tex. Civ. Prac. & Rem. Code § 41.008(b)(2) (providing that, if the amount of the calculated compensatory-damage-based cap is less than $200,000, then exemplary damages are capped at $200,000). Because we rejected Zafar's challenge to the award of past-mental-anguish damages, her contingent argument is moot. *See* Tex. R. App. P. 47.1.

[13]Zafar argues that, although preservation was unnecessary, *see infra* note 14, she nonetheless preserved her complaint by raising it in a JNOV. But we rejected a similar argument in *Grisel. See Grisel v. Everest Int'l, LLC,* No. 02-19-00401-CV, 2022 WL 714516, at *18 n.18 (Tex. App.—Fort Worth Mar. 10, 2022, pet. denied) (holding that the defendants did not preserve their charge complaint).

exemplary damages—malicious prosecution—with a theory that did not—intentional infliction of emotional distress—the charge was fatally flawed.[14] And indeed, when a broad-form question commingles valid and invalid bases for damages and the question is submitted over the appellant's timely and specific objection, such commingling is presumptively harmful. *Horton v. Kan. City S. Ry. Co.*, 692 S.W.3d 112, 139–45 (Tex. 2024) (op. on reh'g); *Harris County v. Smith*, 96 S.W.3d 230, 232–36 (Tex. 2002); *see Grisel*, 2022 WL 714516, at *17–18 (recognizing rule in review of jury-charge complaint involving an exemplary damages question that referenced a prior broad-form liability question commingling a theory of fraud that supported exemplary damages with one that did not). But this is only if the appellant raises a timely and specific objection to preserve the error for appellate review. *Grisel*, 2022 WL 714516, at *17–18 (holding that appellants failed to preserve jury-charge error); *see Smith*, 96 S.W.3d at 236 ("A timely objection, plainly informing the court that a specific element of damages should not be included in a broad-form question because there is no evidence to support its submission, therefore preserves the error for appellate review.").

---

[14]In her reply brief, Zafar attempts to avoid the preservation issue by arguing that she is not challenging the broad-form question on compensatory damages but is instead highlighting Saghier's waiver of intentional infliction of emotional distress as a predicate for exemplary damages. But Zafar explains the significance of such purported waiver by asserting that it precludes "[m]eaningful appellate review of whether the mental[-]anguish damages . . . can serve as a punitive[-]damages predicate." And this explanation confirms that the broad-form question on compensatory damages is at the heart of her complaint.

Zafar did not object to the broad-form questions on compensatory damages, nor did she object to the exemplary-damages question, nor to the failure to condition the jury's award of damages on its responses to other questions, nor to the broader structure of that portion of the charge. Zafar has thus failed to preserve her jury-charge complaint, and we overrule this portion of her issue.[15]

### 2. Statutory Cap

Zafar's other challenge to the exemplary-damages award is fairly cut and dried. She argues that, to the extent that we have reversed any of the compensatory-damage awards, we must recalculate the statutory cap on exemplary damages accordingly. After all, Chapter 41's statutory cap on exemplary damages is premised on the amount of compensatory damages, and that amount has now changed. *See* Tex. Civ. Prac. & Rem. Code § 41.008(b)(1). Saghier does not dispute the statutory cap's applicability or the need for an adjustment. *Cf. Bennett*, 525 S.W.3d at 649–50 (affirming application of exception to statutory cap in malicious-prosecution case when jury findings confirmed that defendant had secured execution of the indictment by deception).

Because we have concluded that there was legally insufficient evidence to support the jury's awards of $15,095 in economic damages for Saghier's criminal

---

[15]Moreover, Zafar has—seemingly inadvertently—conceded this issue. She argues that the broad-form question on mental-anguish damages harmed her by precluding appellate review because there was no way to determine what claim the jury was compensating Saghier for. Yet, the broad-form question on mental-anguish damages asked the jury to compensate Saghier for "the occurrence in question," and in Zafar's reply brief, she identifies and emphasizes that "the occurrence in question" was "the malicious prosecution."

attorney's fees and $255,004 in noneconomic damages for Saghier's future mental anguish, Saghier's remaining economic damages total $12,875 (for past medical expenses and miscellaneous criminal-prosecution-related fees) and her noneconomic damages total $255,004 (for past mental anguish). Saghier's exemplary damages are thus statutorily capped at $280,754. We sustain this portion of Zafar's exemplary-damages issue and modify the judgment accordingly.[16]

---

[16]In her reply brief, Zafar implies that, if this court reverses any component of the compensatory-damages award, then exemplary damages must be remanded for a reassessment. But the case Zafar cites for this remand requirement—*Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002) (partial plurality op.)—is distinguishable.

*Bentley* involved the Texas Supreme Court's recognition that, although the compensatory damages had changed, it could not review a complaint regarding the factual sufficiency of the exemplary damages, so it remanded that issue to the intermediate court. *See Bentley*, 94 S.W.3d at 607 & n.146 (citing *Tatum v. Preston Carter Co.*, 702 S.W.2d 186, 187–88 (Tex. 1986), in plurality portion of opinion); *Tatum*, 702 S.W.2d at 188 (reiterating that "[w]hether a jury award of damages is excessive is a question of fact over which this court has no jurisdiction"); *Bunton v. Bentley*, 176 S.W.3d 21, 23 (Tex. App.—Tyler 2005, pet. denied) (op. on remand) (noting that the Texas Supreme Court "ruled that Bunton is entitled to raise a claim that the punitive damages are unconstitutionally excessive in light of the reduction of the compensatory[-]damage award and remanded the case back to us for our review of the exemplary[-]damage award"). This court—unlike the Texas Supreme Court—has jurisdiction to review factual-sufficiency complaints. *See Anderson*, 550 S.W.3d at 620 (clarifying that "excessiveness of a damages award is a factual-sufficiency inquiry committed to the court of appeals' exclusive jurisdiction"); *Bearden*, 2022 WL 3273598, at *19 (noting that factual sufficiency complaints are "committed to our exclusive jurisdiction"); *Bunton*, 176 S.W.3d at 23 (reviewing excessiveness complaint). And regardless, Zafar does not raise such a complaint here; her factual-sufficiency challenge to the exemplary-damages award is conditioned on our reversal of all of Saghier's mental-anguish damages and is thus moot. *See supra* note 12.

## C.    Leading Questions

In her final issue, Zafar asserts that the trial court "abused its discretion by permitting Saghier's counsel to lead her." Zafar points to a series of leading questions that Saghier's counsel asked, and she claims that such leading questions "permeated Saghier's entire testimony" and "bolster[ed] Saghier's credibility." But Zafar objected to only three of the leading questions she challenges on appeal.[17] *See* Tex. R. App. P. 33.1(a).

Specifically, Zafar objected when Saghier's counsel asked her,

- "[B]y smacking a . . . co-worker . . . in the face during work hours with plenty of people around, you would be jeopardizing your entire career?"

- "Have you ever been in a physical altercation with another human being[;] tell this jury, yes or no?" and

- "And do you know what Dr. Crowder is? . . . Psychiatrist[?]"

Even if we assume that the trial court abused its discretion by allowing those three leading questions and Saghier's corresponding responses—"Yes," "No," and "Psychiatrist"—we fail to see how such testimony could have materially influenced the verdict. *See* Tex. R. App. P. 44.1(a)(1).

---

[17]In her reply brief, Zafar argues that she preserved a challenge to all of Saghier's counsel's leading questions. She claims that the trial court demonstrated its awareness of Zafar's implicit running objection when it later explained the legal basis for its authorization of Saghier's counsel's leading questions. But the trial court's explanation showed only that the trial court was aware of the three objections that Zafar had enunciated; the trial court's comment cannot be extrapolated into an implied running objection or a ruling on objections that Zafar did not raise.

The "[e]rroneous admission of [testimony] is harmless unless the error probably (though not necessarily) caused rendition of an improper judgment." *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008); *see* Tex. R. App. P. 44.1(a)(1). And "if the inadmissible [testimony] was cumulative, then the error was likely harmless." *Perez*, 2022 WL 17351581, at *3. Here, Saghier's responses to the three objected-to leading questions were cumulative of other evidence.

When Saghier was asked if "smacking a . . . co-worker . . . in the face . . . would [have] be[en] jeopardizing [her] entire career," she had already testified that she knew Zafar's allegation of assault jeopardized her medical career. Saghier told the jury that part of the reason she sought psychiatric help within a day of Zafar's assault allegation was because, "[w]hen you're a doctor, you know what is at stake here. Your whole life. Your license is at stake."

Similarly, even before Saghier's counsel asked her about "ever [having] been in a physical altercation," Saghier had already confirmed that she had never been in a fight, "No."

And Saghier's clarification that Dr. Crowder was a psychiatrist came after Saghier had already described him as a "forensic psych expert" and after his fitness-to-practice evaluation report had already been admitted into evidence. The letterhead on Dr. Crowder's report reflected that he practiced "General and Forensic Psychiatry," his signature block showed that he held an "MD," and in the report itself, Dr. Crowder stated that he had performed a "psychiatric evaluation" of Saghier.

32

In short, the three objected-to leading questions did not present the jury with any new—much less verdict-altering—information. *See* Tex. R. App. P. 33.1(a), 44.1(a). Thus, even if the trial court abused its discretion by allowing the leading questions, the error was harmless.

We overrule Zafar's final issue.

### III. Conclusion

The evidence was legally insufficient to support either the jury's award of $15,095 for Saghier's criminal attorney's fees or its award of $255,004 for Saghier's future mental anguish. We reverse these portions of the judgment and, reapplying the statutory cap, reduce the award of exemplary damages to $280,754. The remainder of the judgment is affirmed as modified.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: July 30, 2026